UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| DENNIS L. HAMPTON, | Case No. 17-cv-02004-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | Re: ECF No. 16 |

## INTRODUCTION

Plaintiff Dennis L. Hampton seeks judicial review of a final decision by the Commissioner of

the Social Security Administration ("Commissioner") denying his claim for disability benefits

under Title II of the Social Security Act.[1] Mr. Hampton moved for summary judgment;[2] the

Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil

Local Rule 16-5, the case is submitted for decision without oral argument. All parties have

---

[1] Compl. – ECF No. 1 at 2 (¶ 9). Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] Mot. – ECF No. 16.

[3] Mot. – ECF No. 19.

consented to magistrate jurisdiction.[4] The court grants the plaintiff's motion, denies the

Commissioner's cross-motion, and remands for further proceedings.

# STATEMENT

## 1. Procedural History and Prior Administrative and Judicial Rulings

In 2004, Mr. Hampton, then age 35, filed an application for Social Security disability

insurance ("SSDI") benefits under Title II of the Social Security Act, alleging a back injury,

arthritis in his back, and depression.[5] He also filed a claim for supplemental security income

("SSI") benefits under Title XVI.[6] The Commissioner denied his SSDI and SSI claims,[7] and Mr.

Hampton timely requested a hearing before an Administrative Law Judge ("ALJ").[8] On August

30, 2005, the ALJ heard testimony from Mr. Hampton.[9] On December 29, 2005, the ALJ found

that Mr. Hampton was not disabled because he could perform his past work as an office worker.[10]

Mr. Hampton reapplied for SSDI benefits on February 2, 2007 and December 31, 2008.[11] The

Commissioner denied those applications.[12]

On July 7, 2010, Mr. Hampton, then age 41, filed another application for SSDI benefits,

alleging back and neck injury, arthritis, fibromyalgia, bipolar, severe depression, and anxiety.[13] He

---

[4] Consents – ECF Nos. 4, 8.

[5] AR 110, 849.

[6] *Id.*

[7] AR 110.

[8] AR 110, 849.

[9] AR 110.

[10] AR 119, 121.

[11] AR 181.

[12] *Id.*

[13] AR 123, 126, 178. The application was filed on July 7, 2010 (AR 123) and completed on July 19, 2010 (AR 178).

alleged an onset date of December 26, 2006.[14] On December 3, 2010, the Commissioner denied his claim.[15]

Mr. Hampton timely appealed the Commissioner's decision and requested an ALJ hearing.[16] On September 19, 2011, ALJ K. Kwon held the hearing and heard testimony from Mr. Hampton and a vocational expert.[17] On November 5, 2011, the ALJ issued an unfavorable decision ("2011 ALJ decision"), holding that Mr. Hampton was not disabled because despite his limitations, he was capable of working at jobs that exist in the national economy.[18] The Appeals Council denied Mr. Hamilton's request for review on June 19, 2013.[19]

On October 4, 2013, Mr. Hampton appealed the 2011 ALJ decision to this court.[20] Mr. Hampton argued that the ALJ erred by (1) improperly rejecting the medical evidence from the examining psychologist, Dr. Zipperle, and (2) failing to provide legally sufficient reasons to reject Mr. Hampton's testimony.[21] On August 12, 2014, the district judge remanded the case for further administrative proceedings. *Hampton v. Colvin*, No. 13-cv-04624-MEJ, 2014 WL 3962618 (N.D. Cal. Aug. 12, 2014) ("*Hampton I*"). For the first issue (the "limited weight" that the ALJ gave to examining psychologist Dr. Zipperle's opinion), the court held that the ALJ provided "a specific and legitimate reason to discount Dr. Zipperle's opinion." *Id.* at *7. For the second issue (the ALJ's assessment of the credibility of Mr. Hampton's testimony about his symptoms), the court held that the ALJ "failed to provide legally sufficient reasons to reject . . . [Mr. Hampton]'s testimony."[22] The court observed that in evaluating Mr. Hampton's credibility, the ALJ could discredit Mr. Hampton's testimony based on his reported activities, his treatment records, and his

---

[14] AR 178.

[15] AR 123, 126–30.

[16] AR 110, 145–46, 849.

[17] AR 38–105, 849.

[18] AR 23–33.

[19] AR 7–9.

[20] AR 871–73.

[21] *Id.*; AR 891.

[22] *Id.*

treatment-seeking history; the court held, however, that the ALJ, "was required to provide clear and convincing reasons for discrediting [Mr. Hampton's] subjective complaints" about the severity of his symptoms and had not done so.[23] The court directed the following: "on remand the ALJ must reassess the evidence in the record, and if the ALJ continues to discount any of Plaintiff's subjective complaints, must provide clear and convincing reasons for doing so consistent with this order."[24]

On August 10, 2015, ALJ Kwon held a supplemental hearing on remand.[25] Mr. Hampton and vocational expert Stephen P. Davis testified at the hearing.[26] On November 23, 2015, the ALJ issued her decision ("2015 ALJ decision").[27] The ALJ noted that the Social Security Act required Mr. Hampton to establish his disability on or before the expiration of his coverage on December 31, 2011 (and sometime after his alleged onset date of December 26, 2006) (the "relevant period").[28] The ALJ denied Mr. Hampton disability benefits because his impairments during the relevant period were not severe enough to keep him from performing his past relevant work as a vending machine attendant.[29] In the alternative, the ALJ found that "[b]ased on the testimony of the vocational expert" and "considering [Mr. Hampton's] age, education, work experience, and residual functional capacity ("RFC"), [Mr. Hampton] was capable of making a successful adjustment to other work that existed in significant numbers in the national economy" during the relevant period. The Appeals Council denied Mr. Hampton's request for review.[30] Mr. Hampton

[23] *Id.*

[24] *Id.*

[25] AR 806–45.

[26] *Id.*

[27] AR 788–99.

[28] AR 789, 791.

[29] AR 797–99.

[30] AR 776–79, 784.

timely appealed the 2015 ALJ decision and moved for summary judgment.[31] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[32]

## 2. Summary of Medical Evidence

### 2.1.1 Dr. John Pendleton: Primary-Care Physician — Treating

Mr. Hampton began seeing Dr. John Pendleton at the Petaluma Health Center in 2005.[33] Dr. Pendleton's treatment notes show a history of depression, chronic pain, insomnia fibromyalgia, syncope (fainting), degenerative disc disease, anxiety, and hypertension.[34]

In 2008, Mr. Hampton was struggling with obesity, insomnia, chronic pain, and anxiety.[35] Dr. Pendleton prescribed the following medications: Effexor, Remeron, Ambien, and Klonopin.[36] In late 2009, Dr. Pendleton reported that Mr. Hampton was using marijuana twice a day for his anxiety and depression.[37] Dr. Pendleton started Mr. Hampton on Vistaril and Xanax to treat his anxiety.[38]

In early 2010, Dr. Pendleton began treating Mr. Hampton for fibromyalgia, irritable-bowel syndrome, hypertension, and lower-back syndrome (in addition to treating Mr. Hampton's chronic pain, anxiety disorder, and bipolar disorder).[39] Dr. Pendleton prescribed Mr. Hampton the following medications: Dilaudid, Methadone, Klefex, and Baclofen for pain management; Ambien for insomnia; Albuterol; Xanax or Cymbalta for anxiety; Terazosin; Phenegran, Indomethacin;

---

[31] Mot. – ECF No. 16.

[32] Mot. – ECF No. 19.

[33] AR 472.

[34] AR 296–367, 436–60, 1296–1304.

[35] AR 340–48.

[36] *Id.*

[37] AR 315.

[38] *Id.*

[39] AR 297–309.

Lyrica; Lisinopril; Klonopin; Donnotal; Effexor or Tegretol for bipolar; and Metropolol for hypertension.[40]

Dr. Pendleton's notes from June 2010 indicate a "red flag" when Mr. Hampton was "unable to give [a] urine sample" and were notated to: "follow opiate use carefully."[41] In August 2010, Dr. Pendleton stated that Mr. Hampton was "not sleeping well," had "increased depression," and was "trying to do on-line school."[42]

On March 3, 2011, Dr. Pendleton completed a Cervical Spine Residual Functional Capacity Questionnaire[43] and diagnosed Mr. Hampton with degenerative-disc disease and chronic neck-and-back pain.[44] Dr. Pendleton noted that Mr. Hampton was "quite impaired by chronic insomnia, anxiety, [and] depression."[45] He described the severity of Mr. Hampton's pain as "daily pain for most of the day."[46] Mr. Hampton experienced side effects of dizziness and drowsiness from Dilaudid/Klonopin that "may have implications for working."[47] Dr. Pendleton said that Mr. Hampton could sit, stand, or walk for a total of two hours within an eight-hour working day[48] and must include five minutes of walking every 30 minutes during his work day.[49] Dr. Pendleton noted that he would need to do an "O.T. evaluation" to answer the questions about how much weight Mr. Hampton could carry in a competitive work situation or how long Mr. Hampton could sit or stand at one time.[50] Dr. Pendleton stated that the description of symptoms and limitations applied as early as 2007.[51]

---

[40] AR 297–309.

[41] AR 440.

[42] AR 299.

[43] AR 472–76.

[44] AR 472.

[45] AR 476.

[46] AR 472.

[47] AR 473.

[48] AR 475.

[49] *Id.*

[50] AR 474–75.

[51] AR 476.

### 2.1.2  Dr. Ken Weinstock: Psychiatrist — Treating

Dr. Ken Weinstock is a psychiatrist at Petaluma Health Center and is Dr. Pendleton's colleague. Dr. Weinstock saw Mr. Hampton on October 19, 2011[52] and April 11, 2012[53] (after the November 2011 ALJ hearing). In his October 2011 notes, Dr. Weinstock indicated that Mr. Hampton had a history of bipolar disorder, had an assessment of personality disorder, and was in remission for amphetamine dependency.[54] Dr. Weinstock noted that Mr. Hampton's mood was "irritable and frustrated" and that his demeanor was "friendly, calm, and not at all sedated."[55] He reported that Mr. Hampton was irritated by his wife's "change in personality" when she returned from rehab.[56] Mr. Hampton was taking Metroprolo, Listinopril, Ventolin, Ambien, Tenezosin, Remeron, Klonophin, Tegretol, Carbmarsepine, Pentanyl, and Percocet.[57] Mr. Hampton's "medications and general affect [were] well regulated to his baseline."[58] Dr. Weinstock had no acute psychiatric concerns that day.[59]

In April 2012, Dr. Weinstock noted that Mr. Hampton "recently filed divorce papers" from his fourth wife and was "smoking [marijuana] occasionally."[60] Dr. Weinstock's psychiatric exam noted that Mr. Hampton had a "friendly and calm" demeanor and a "frustrated" mood. Dr. Weinstock recommended that Mr. Hampton "continue Remeron, Effexor, [and] Tregretol."[61]

---

[52] AR 1191.

[53] AR 1187.

[54] AR 1191.

[55] Id.

[56] Id.

[57] Id.

[58] Id.

[59] Id.

[60] AR 1187.

[61] Id.

United States District Court
Northern District of California

### 2.1.3 Dr. John Alchemy: Family Practitioner — Examining

On October 24, 2010, Dr. John Alchemy completed a comprehensive internal-medicine evaluation.[62] He diagnosed Mr. Hampton with "chronic low back and neck pain, uncontrolled substance, . . . [h]ypertension, not controlled, . . . [and] [o]ngoing tobacco abuse."[63] Dr. Alchemy did not evaluate Mr. Hampton's history of bipolar, depression, and anxiety.[64] Dr. Alchemy found that Mr. Hampton had "[n]o limitations" for "sitting, walking, standing, or lifting,"[65] but he noted that Mr. Hampton "walk[ed] in a slightly flexed posture with a cane . . . [and] moans when he stands up from a chair."[66]

While Dr. Alchemy was testing Mr. Hampton's range of motion, Mr. Hampton momentarily lost consciousness when he "turn[ed] his head to the right side and titlt[ed] back."[67] Mr. Hampton "close[d] his eyes and list[ed] backward."[68] During this episode, Mr. Hampton "[was] easily supported and his eyes open[ed] within 2–3 seconds."[69] Mr. Hampton and his wife reported that "this [was] [a] normal event [for Mr. Hampton] with neck motion."[70] Dr. Alchemy could not provide a reason "related to an objective documented condition" for Mr. Hampton's "brief momentary loss of consciousness."[71] Dr. Alchemy found that Mr. Hampton should "no[t] work at heights, around heavy machinery, at extreme temperatures, or in safety-sensitive work environments."[72] Dr. Alchemy imposed "workplace environmental activity limitations" due to Mr. Hampton's "stated loss of consciousness."[73] Dr. Alchemy concluded that Mr. Hampton should

---

[62] AR 379–83, 459–64.

[63] AR 382, 463.

[64] Id.

[65] AR 382-83, 464.

[66] AR 381, 462.

[67] AR 381.

[68] Id.

[69] AR 381, 462.

[70] Id.

[71] Id.

[72] AR 383, 464.

[73] Id.

"no[t] climb[] or balance[]" and should "continue using the cane" for comfort, but he could not "document a condition [] which would necessitate the use of a cane."[74]

### 2.1.4 Dr. Marion-Isabelle Zipperle: Psychologist — Examining

On October 28, 2010, Dr. Marion-Isabelle Zipperle, a clinical psychologist, performed a comprehensive psychiatric evaluation of Mr. Hampton.[75] During the examination, Mr. Hampton claimed that he was "in chronic pain, [] depressed[,] and moody."[76] Dr. Zipperle reported that Mr. Hampton "need[ed] help to bathe and dress"[77] and did not perform yard work or help clean the house because "he c[ould] not bend."[78] Mr. Hampton also stated that he "very rarely dr[ove]," but Dr. Zipperle's staff saw Mr. Hampton drive himself away after the examination.[79] Mr. Hampton had trouble walking and brought a cane to the examination.[80] Mr. Hampton was cooperative and "[d]epressed, quiet, coherent, and logical" and "despairing."[81] Dr. Zipperle noted no deficits in intellectual functioning.[82]

Dr. Zipperle diagnosed Mr. Hampton with a "pain disorder, post-traumatic stress disorder, bipolar disorder, panic disorder with agoraphobia, amphetamine dependence in remission, and a personality disorder."[83] Dr. Zipperle gave the following prognosis:

> The claimant's prognosis is poor due to the fact that he has mood swing keeping him from functioning correctly. He is expansive, has racing thoughts, is impulsive, does things he regrets, has poor judgment, had an accident in which that he re-lives, flashbacks, nightmares, intrusive thoughts, becomes equally depressed, no motivation, no energy, withdrawn, crying, helpless, hopeless, feeling self-esteem, self-confidence, suicidal with no plan, nightmares, anxiety about going out and being in crowds and open spaces. He does not have any apparent cognitive impairment.

---

[74] AR 383.

[75] AR 386–89.

[76] AR 386.

[77] AR 387.

[78] *Id.*

[79] AR 386.

[80] AR 387.

[81] AR 387–88.

[82] AR 388.

[83] *Id.*

His impairments are emotional, psychological, and they would not improve in 12 months. He is in therapy periodically.[84]

Dr. Zipperle described Mr. Hampton's functional assessment as follows:

The claimant can manage his own money.

The claimant can perform simple and repetitive tasks.

The claimant could not accept instructions from supervisors or interact with coworkers and the public.

The claimant would need special or additional instructions to work. He could not maintain regular attendance in a workplace and he would have problems completing a workday because of his performance issue from his psychiatric problems.

The claimant has impaired ability to handle stress in a workplace.[85]

### 2.1.5  Dr. Norman Zukowsky: Psychiatric Consultant (PhD) — Consulting

On November 17, 2010, Dr. Norman Zukowsky, PhD, the state-agency psychiatric consultant, completed two checklist forms, a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.[86] In the Psychiatric Review Technique, Dr. Zukowsky found that Mr. Hampton had mild restriction of activities in daily living, moderate difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence, and pace, and no repeated episodes of decompensation.[87]

In the Mental Residual Functional Capacity Assessment, Dr. Zukowsky found that Mr. Hampton was moderately limited in the following: "ability to understand and remember detailed instructions;" "ability to carry out detailed instructions;" and "ability to interact appropriately with the general public."[88] Dr. Zukowsky said that Mr. Hampton could "understand and remember 1- and 2-step instructions," "accept supervision[,] and generally get along with others."[89] He noted that Mr. Hampton's "psychiatric symptoms may interfere with interactions with others at times, so

---

[84] AR 389.

[85] *Id.*

[86] AR 393–406.

[87] AR 401.

[88] AR 404–05.

[89] AR 406.

[Mr. Hampton] should not interact with the public consistently."[90] Dr. Zukowsky said that Mr. Hampton was "most likely" to have "employment success . . . if assigned 1- or 2-step duties in a non-public setting."[91]

As part of Mr. Hampton's case analysis, Dr. D. Pong, MD, reported that Dr. Zukowsky had noted that (1) the accuracy of Mr. Hampton's (and his wife's) "ADL" (Activities of Daily Living) questionnaire was uncertain based in part on Mr. Hampton's claim that he did not drive but was seen driving away from his appointment with Dr. Zipperle;[92] (2) Dr. Zipperle's assessment "confuses what [Mr. Hampton] has reported and what she [Dr. Zipperle] observe[d] or conclude[d]," (3) the "diagnoses and deficits in [Mr. Hampton's] work abilities appear largely unsupported except by [Mr. Hampton's] allegation[s],"[93] and (4) "because [Mr. Hampton] [was] able to drive/travel independently when necessary, [was] fulfilling requirements of an online school, and interact[ed] with others in an acceptable fashion," Mr. Hampton "c[ould] at least perform duties of a few steps in a competitive, nonpublic work setting."[94]

### 3. Mr. Hampton's Testimony — 2011 and 2015 Hearings

At the September 19, 2011 hearing, Mr. Hampton testified that he worked as a truck driver from 1999 to December 26, 2006, the date of a syncope-related accident, and had not worked since.[95] At the time of the hearing, Mr. Hampton was living with his third wife,[96] "living off of family loans, [his] wife's trust fund, and [a] worker's comp claim."[97] In 2010, Mr. Hampton enrolled in online classes at the Art Institute in Pittsburg and took one class every six weeks.[98] Mr.

---

[90] Id.

[91] Id.

[92] AR 409. The attribution to Dr. Zukowsky of these obstacles is in a report signed by "D. Pong MD."

[93] Id.

[94] Id.

[95] AR 934–35.

[96] AR 934.

[97] AR 936.

[98] AR 939.

Hampton testified that he had four to five assignments per week and spent roughly ten hours a week on his assignments — roughly an hour and a half a day.[99] He failed a class "due to an inability to spend that much time on a computer,"[100] and his prescribed medication made him drowsy.[101]

The ALJ asked Mr. Hampton what was keeping him from working.[102] Mr. Hampton testified that his back and neck caused him a lot of pain so he "constantly had to change [his] position, can't sit upright in a chair for very long, [and] had to be able to get up and walk around . . . about every 10 to 20 minutes . . . or lean against a wall . . . and then lay down . . . at least a half an hour of every hour."[103] Mr. Hampton testified that he saw his primary care physician, Dr. Pendleton, once a month.[104] Dr. Pendleton prescribed his medications "for the last couple of years."[105] Mr. Hampton reported that the medications "cover about 75% of the pain."[106] Mr. Hampton acknowledged that he had not sought treatment for the rest of the pain.[107] He reported that an average day consisted of his waking up at "10 or 10:30 a.m.," taking his medication, sitting "in bed for two hours [un]til the medicine takes effect," "get[ting] out of bed . . . [to] sit in his recliner for part of the day, . . . and then, about halfway through the day, I end up back in the bedroom again laying down because the recliner started to hurt my back, so I need to change positions."[108] If it is a "good day," Mr. Hampton would get dressed and goes with his wife to the grocery

---

[99] AR 940–41, 943.

[100] AR 944.

[101] AR 960.

[102] AR 946.

[103] AR 946–47.

[104] AR 950.

[105] AR 960.

[106] AR 947.

[107] AR 948.

[108] AR 961.

store.[109] Mr. Hampton testified about the side effects from the medications, such as his being "lethargic, sleepy, dizzy" and having "diarrhea."[110]

Regarding his syncope, Mr. Hampton said that he passed out "once every two, three days,"[111] requiring either trips to the emergency room (mostly) or crawling back into bed (sometimes) because[112] "it's not worth sitting in the emergency room for seven hours."[113] Mr. Hampton testified that he could carry up to 10 pounds,[114] was pursuing a hobby in photography,[115] and "visit[ed] his parents weekly.[116] He said that he did not drive except for in "a rare emergency" such as when his wife was really sick.[117]

On August 10, 2015, Mr. Hampton testified on remand before ALJ Kwon at a supplemental hearing.[118] The ALJ questioned Mr. Hampton about matters including his marital status, living situation, education level, daily living activities, medical conditions, and work history.[119] Mr. Hampton testified that he was now divorced and living with his parents (but had been living with his ex-wife during the relevant period).[120] Mr. Hampton completed high school and a year and a half of college credits as a part-time student but was unable to finish his degree because of the side effects of his medications, which "fuzz[ed] his brain."[121]

Mr. Hampton testified that he last worked as commercial truck driver but had not worked since December 26, 2006, when he was in a traffic accident after a syncope episode where he "blacked

[109] AR 962.

[110] AR 960.

[111] AR 950–51.

[112] Id.

[113] AR 951.

[114] AR 964.

[115] AR 965.

[116] AR 967.

[117] AR 938.

[118] AR 806–08.

[119] AR 811–36.

[120] AR 811.

[121] AR 811, 822–23, 840.

out behind the wheel and hit a guy head-on" in his truck and lost his commercial driver's license; he eventually lost his regular driver's license too because of his medical condition.[122] Mr. Hampton testified that he had blacked out a few times before the accident[123] and "once every two to three months" after the accident.[124] Mr. Hampton described a syncope episode as "hit[ting] the floor and out cold for . . . 30 seconds."[125] Mr. Hampton said that he was now better able to recognize an upcoming syncope episode, which includes "tingling up the back of [his] neck" and "lightheadedness."[126] He testified that his current medications stabilized his syncope and bipolar symptoms and that he had not had an episode for approximately one year or more.[127]

Mr. Hampton testified that he spent most of his time at home[128] and that his parents assisted him with laundry and cooking[129] (although he did "laundry a couple times" and "occasionally cook[ed] a meal."[130] Mr. Hampton said that he did not now do any grocery shopping[131] but made his bed and took care of personal care: "dressing, showering and all that. . . . ."[132] Mr. Hampton testified that he had a girlfriend and occasionally saw friends.[133]

Mr. Hampton testified that he had not driven since 2006, except for once when he "drove [his] girlfriend home because she had a little too much to drink."[134] Family members gave him rides,

---

[122] AR 811–14.

[123] AR 813.

[124] AR 814–15.

[125] AR 816.

[126] AR 817.

[127] AR 815, 818.

[128] AR 826.

[129] *Id.*

[130] *Id.*

[131] AR 827.

[132] AR 826.

[133] AR 827.

[134] AR 813–14.

and he took the bus.[135] Mr. Hampton testified he did photography "occasionally . . . once every two to three months" between 2006 and 2011.[136]

He testified that a psychiatrist at Petaluma Health Center first prescribed him medication, but he could not recall her name.[137] Then, Mr. Hampton's primary-care physician, Dr. Pendleton, started monitoring Mr. Hampton's medications because Mr. Hampton did not have a good relationship with the psychiatrist.[138] The ALJ asked Mr. Hampton how he managed his pain.[139] Mr. Hampton responded that from 2006 to 2011, he took Dilauded, Percocet, Tegretol, and Morphine for pain management.[140] He said that he spent lots of time in bed and was often fatigued during the day,[141] napping between two to four hours every day.[142] Mr. Hampton tried physical therapy unsuccessfully for six months.[143] He tried acupuncture, which gave him temporary relief for one to two hours after each appointment.[144] Mr. Hampton testified that he started using a fentanyl pain patch on his back in October 2011,[145] which was more effective for pain management than pills, which he described as a "pill rollercoaster."[146] Mr. Hampton testified that he changed positions often throughout the day to manage the pain.[147]

The ALJ asked Mr. Hampton about his experience "ghost hunting" in 2008.[148] Mr. Hampton explained he got into "ghost hunting" in early 2008 through a friend and "quit going four months

---

[135] AR 827.

[136] AR 828.

[137] AR 820.

[138] AR 820–21.

[139] AR 831.

[140] AR 838.

[141] *Id.*

[142] AR 839.

[143] AR 830.

[144] AR 831.

[145] *Id.*

[146] AR 831, 1303.

[147] AR 831.

[148] AR 831–32.

later."[149] He described "ghost hunting" as answering house calls for people who believe that their house is haunted[150] and using monitoring equipment to detect paranormal activity.[151] Mr. Hampton's role was watch the monitor to give the group members bathroom or other breaks, and he was an active participant for 10 to 15 minutes at a time.[152]

### 4. Vocational Expert Stephen P. Davis's Testimony — 2015

Stephen P. Davis, a vocational expert ("VE"), testified at the ALJ hearing on remand on August 10, 2015.[153] The ALJ asked Mr. Davis to classify Mr. Hampton's past work.[154] Mr. Davis stated that Mr. Hampton had been a truck driver, dump-truck driver, warehouse worker, title clerk, vending machine attendant, and dishwasher.[155] The ALJ posed a hypothetical question to the VE: whether an individual of Mr. Hampton's age, education, and vocational history could perform any of his past relevant work if that person had the following limitations: could "perform light work;" was precluded from "jobs that require climbing ladders, ropes, and scaffolding;" could do "no work at heights or with heavy and hazardous machinery or driving;" was restricted to jobs that "remain simple and routine with a maximum [Special Vocational Preparation] SVP of 2;" could perform no jobs with "interaction with the general public in terms of the primary duties of the job;" and could not do "teamwork projects."[156] Mr. Davis testified that such a person could perform Mr. Hampton's past work as a "vending machine vendor."[157] The ALJ then asked the VE to "give three [additional] examples that would fit [the] hypothetical."[158] Mr. Davis stated that

---

[149] AR 832.

[150] AR 831–833.

[151] *Id.*

[152] AR 834.

[153] AR 806, 841–45.

[154] AR 842.

[155] AR 852.

[156] AR 842–43.

[157] AR 843.

[158] *Id.*

such a person also could work as an "assembler of electrical equipment," a "shipping and receiving weigher," and a "lamination inspector."[159]

Then the ALJ posed a second hypothetical, adding that the person would either "miss work three days or more every single month or be off task while they are at work, one or the other, on a 25% or more chronic basis."[160] Mr. Davis testified that a person with those limitations could not perform the above-mentioned work, and the limitations "would rule out all work" in the national economy.[161]

Mr. McCaskell, Mr. Hampton's representative, asked the VE, "if the person [from the first hypothetical] was unable to concentrate for two-hour windows at a time to do simple repetitive tasks, would they be able to perform any of that work."[162] Mr. Davis testified, "no."[163]

## ANALYSIS

### 1. Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record

---

[159] AR 843–44.

[160] AR 844.

[161] *Id.*

[162] *Id.*

[163] *Id.*

supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## 2. Applicable Law

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). "To determine whether or not a claimant is disabled, [the] ALJ follows a five-step evaluation." *Zavalin v. Colvin*, 778 F.3d 842, 846 n.1 (9th Cir. 2015) (citing 20 C.F.R. § 416.920(a)(4)). This five-step analysis is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

### 3. Application

On remand, the ALJ followed the five-step sequential evaluation process to determine whether Mr. Hampton was disabled and concluded that he was not.[164]

At step one, the ALJ found the Mr. Hampton did not engage in substantial gainful activity during the relevant period (from his alleged onset date of December 26, 2006 through his last day of coverage on December 31, 2011).[165]

At step two, the ALJ found that Mr. Hampton had the following severe impairments: "arthritis, headaches, fibromyalgia, obesity, depressive disorder, [and] anxiety disorder."[166] The ALJ found that Mr. Hampton's "medically established disorders more than minimally affect[ed] [his] ability to perform work related activities, and . . . [were] severe."[167] The ALJ noted there was evidence of other impairments in Mr. Hampton's medical records, such as, "hypertension, asthma, bronchitis, appendicitis, and obesity" but found that there was "no evidence [that the] impairments interfere[d] with [Mr. Hampton]'s ability to work."[168]

---

[164] AR 789; *see also* 20 CFR 404.1520(a).

[165] AR 791.

[166] *Id.*

[167] *Id.*

[168] *Id.*

At step three, the ALJ found that Mr. Hampton did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[169] The ALJ found that the record did not support the existence of any such functional limitations, and "no treating or examining physician [] reported findings, which either [met] or [were] equivalent in severity to the criteria of any listed impairment."[170] The ALJ found that Mr. Hampton's mental impairments — individually and combined — did not meet Listings 12.04 and 12.06 because Mr. Hampton did not have "marked" limitations in daily living, social functioning, or concentration, persistence, or pace.[171]

The ALJ found only mild restrictions in daily living because Mr. Hampton "testified he [was] able to pursue his hobby of photographing families and landscapes from his car, use[d] Photoshop to edit pictures, . . . and [was] able to cook, do laundry, and carry light groceries."[172] The ALJ noted that Mr. Hampton "was actively part of a ghost hunting group, enrolled as a part time student for most of the period at issue, and was able to drive independently."[173]

The ALJ found mild to moderate difficulties in social functioning based on the assessment of Mr. Hampton's examining psychologist.[174] In addition, giving Mr. Hampton the "benefit of the doubt," the ALJ found "moderate limitations" with concentration, persistence and pace even though Mr. Hampton "testified he is able to read, watch TV, and take online university classes for photography"[175] and — according to his examining and non-examining psychiatric evaluations — was "able to carry out simple instructions without difficulties."[176] The ALJ found no episodes of decompensation of an extended duration.[177]

---

[169] Id.

[170] Id.

[171] AR 792.

[172] Id.

[173] Id.

[174] Id.

[175] Id.

[176] Id.

[177] Id.

Before considering whether Mr. Hampton was able to do any work that he had done in the past under step four of the evaluation process, the ALJ followed a two-step process to determine (1) "whether there [was] an underlying medically determinable physical or mental impairment(s) … that could reasonably be expected to produce [Mr. Hampton's] pain or other symptoms" and (2) the extent to which "the intensity, persistence, or functionally limiting effects of pain or other symptoms" limit Mr. Hampton's functioning.[178] In doing so, the ALJ found that Mr. Hampton's "medically determinable impairments could reasonably be expected to cause his symptoms; however [his] statements concerning the intensity, persistence, and limiting effects of [his] symptoms [were] not entirely credible."[179]

Specifically, the ALJ found that Mr. Hampton's testimony was inconsistent with his "treatment-seeking history, mild findings on examination, and activities of daily living."[180] The ALJ said that Mr. Hampton's allegations that he was "in constant pain, unable to do most daily activities," and "pass[ing] out every 2–3 days" were "belied by the medical record."[181] The ALJ observed that "despite regular office visits, [Mr. Hampton] did not report frequent syncope episodes at any of his appointments in 2009, 2010 or 2011."[182] The ALJ noted that Mr. Hampton was an active participant in a "ghost hunting group . . . which likely required physical and mental activity inconsistent with the level of pain and fatigue [Mr. Hampton] allege[d]."[183] The ALJ stated that Mr. Hampton had "generally reported good relief from pain medication" and testified that he "visit[ed] his parents weekly and [was] able to cook, shop, do laundry, and carry groceries weighing less than 10 pounds, as well as drive."[184] The ALJ noted that Mr. Hampton had told the consultative psychiatric examiner, Dr. Zipperle, that "he very rarely drives;" "however, after the

---

[178] AR 793.

[179] AR 794.

[180] Id.

[181] AR 795.

[182] Id.

[183] Id.

[184] Id.

examination, [Mr. Hampton] was observed driving away in his truck."[185] The ALJ determined that Mr. Hampton's symptoms were not "as severe and limiting as alleged" and were not supported by the medical record.[186]

The ALJ determined that Mr. Hampton had the RFC

> to perform light work as defined in 20 C.F.R. 404.1567(b) except the claimant cannot climb ladders, ropes or scaffolding, no work at heights, or around heavy or hazardous machinery or driving. The claimant *can perform work that is simple and routine with a maximum Specific Vocational Preparation (SVP) of 2*. The claimant should avoid interaction with the general public as a primary duty of the job and no teamwork projects with coworkers.[187]

Applying this RFC and the other factors at step four, the ALJ found that Mr. Hampton was "capable of performing past relevant work as a vending machine attendant."[188] The ALJ noted that such a finding was sufficient to find Mr. Hampton "not disabled" but nevertheless also analyzed his claim under step five as an "alternative" basis for her decision finding no disability.[189]

At step five, the ALJ found that "[b]ased on the testimony of the vocational expert" and "considering [Mr. Hampton's] age, education, work experience, and RFC, [Mr. Hampton] was capable of making a successful adjustment to other work that existed in significant numbers in the national economy,"[190] specifically as an electrical equipment assembler, shipping-and-receiving weigher, or laminator inspector.[191] Ultimately, the ALJ found that Mr. Hampton was not disabled any time during the relevant period from December 26, 2006 through December 31, 2011.[192]

---

[185] *Id.*

[186] *Id.*

[187] AR 793 (emphasis added). Special Vocational Preparation ("SVP") is defined "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles ("DOT"), App. C, 1991 WL 688702 (4th ed. 1991).

[188] AR 797–98.

[189] AR 798.

[190] AR 799.

[191] *Id.*

[192] *Id.*

In his pending motion for summary judgment, Mr. Hampton contends that the ALJ's decision is not supported by substantial evidence because the ALJ "implicitly" rejected the opinion of state-agency psychiatric consultant, Dr. Norman Zukowsky (PhD), despite the ALJ's purporting to give it "great weight."[193] Specifically, Mr. Hampton contends that the ALJ erred by effectively equating Dr. Zukowsky's assessment that Mr. Hampton could "understand and remember 1- and 2-step instructions" with the ALJ's RFC determination that Mr. Hampton "can perform work that is simple and routine."[194]

Before reviewing the merits of this contention, the court addresses whether Mr. Hampton is barred from raising this issue because the court conclusively adjudicated it in *Hampton I*.

### 3.1   Law of the Case Doctrine Does Not Bar Mr. Hampton's Action

In its cross-motion for summary judgment, the Commissioner contends that Mr. Hampton is barred from raising his challenge to the ALJ's decision based on principles of "*res judicata* (or claim preclusion)"[195] because the district court's prior decision in *Hampton I* "resulted in a final decision on the merits" that affirmed the ALJ's weighting and assessment of the medical evidence, including Dr. Zukowsky's assessment.[196]

Although couched as an issue of *res judicata* or claim preclusion, the Commissioner's argument is based in the doctrine of the "law of the case." Under the law-of-the-case doctrine, a court is precluded from revisiting issues that have been decided — either explicitly or implicitly — in a previous decision of the same court or a higher court. *Hall v. City of L.A.*, 697 F.3d 1059, 1067 (9th Cir. 2012); *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). Thus, under the law-of-the-case doctrine, "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995)

---

[193] Mot. – ECF No. 16 at 6.

[194] *Id.* at 5–9.

[195] The Supreme Court uses the term "res judicata" to refer collectively to claim preclusion and issue preclusion. *See*, *e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

[196] Mot. – ECF No. 19 at 6-7.

(quoting *Herrington v. Cty. of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993) (internal quotations omitted)).

In the context of Social Security benefits determinations, the Ninth Circuit has held that the law-of-the-case doctrine applies. *Stacy v. Colvin*, 825 F.3d 563, 567 (9th Cir. 2016). Moreover, "as a general principle, the United States Supreme Court has recognized that an administrative agency is bound on remand to apply the legal principles laid down by the reviewing court." *Ischay v. Barnhart*, 383 F.Supp.2d 1199, 1213–14 (C.D. Cal. 2005) (citations omitted); *see Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) (deviation from the court's remand order in a subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review). Thus, "[w]hen acting under an appellate court's mandate, an inferior court is bound by the decree as the law of the case." *Vizcaino v. U. S. Dist. Court*, 173 F.3d 713, 719 (9th Cir. 1999) (internal quotation marks omitted). In *Smith v. Berryhill*, No. 2:17-CV-00873-DWC, 2018 WL 1633822, at *2–3 (W.D. Wash. Apr. 5, 2018), the district court summarized the relevant Social Security regulations as follows:

> When a Federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or *it may remand the case to an administrative law judge with instructions to take action and issue a decision* or return the case to the Appeals Council with a recommended decision. If the case is remanded by the Appeals Council, the procedures explained in [20 C.F.R.] § 404.977 will be followed. 20 C.F.R. § 404.983 (emphasis added).
>
> Under 20 C.F.R. § 404.977, when the Appeals Council remands a case to the ALJ, the ALJ "shall take any action that is ordered by the Appeals Council and may take any action that is not inconsistent with the Appeals Council's remand order." Accordingly, on remand, the ALJ must follow the specific instructions of the reviewing court. See *Stacy*, 825 F.3d at 567-69.

The Ninth Circuit has described the law-of-the-case doctrine as "a judicial invention designed to aid in the efficient operation of court affairs . . . . Further, the doctrine serves to advance the principle that in order to maintain consistency during the course of a single lawsuit, reconsideration of legal questions previously decided should be avoided." *United States v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004) (citations and internal quotation marks omitted). Moreover, in *Stacy*, the Ninth Circuit explained that the doctrine of the law of the case "is concerned primarily

with efficiency, and should not be applied when the evidence on remand is substantially different, when the controlling law has changed, or when applying the doctrine would be unjust." 825 F.3d at 567.

In *Hampton I*, Mr. Hampton challenged the ALJ decision on the grounds that (1) the ALJ improperly gave "limited weight" to medical evidence opinion given by the examining psychologist, Dr. Zipperle, and (2) the ALJ failed to provide legally sufficient reasons to reject Mr. Hampton's testimony.[197] 2014 WL 3962618, at *6.

On the first issue, the court upheld the ALJ's decision to give only "limited weight" to Dr. Zipperle's opinion, finding that it was supported by "specific and legitimate reason[s]." 2014 WL 3962618, at *9. As such, this determination is now law of the case. *See Stacy*, 825 F.3d at 567; *Hall*, 697 F.3d at 1067. Likewise, on the second issue, the court found that the ALJ had "failed to provide "clear and convincing reasons for discrediting [Mr. Hampton's] subjective complaints" about the severity of his symptoms and remanded the case to allow the ALJ to "reassess the evidence in the record, and if the ALJ continues to discount any of Plaintiff's subjective complaints, … [to] provide clear and convincing reasons for doing so consistent with this order." 2014 WL 3962618, at *10-11.

Accordingly, this court must determine whether these determinations (or any determinations implicit in them) bar either party from pursuing any particular challenge to or defense of the subsequent 2015 ALJ decision. *See Stacy*, 825 F.3d at 567; *Hall*, 697 F.3d at 1067.

In the present action, Mr. Hampton's only argument is his contention that the ALJ erred by failing to explain or provide a legally sufficient basis to support her RFC determination that Mr. Hampton "can perform work that is simple and routine," given Dr. Zukowsky's assessment that Mr. Hampton could "understand and remember 1- and 2-step instructions," which Mr. Hampton contends is a lower functional limitation than the "simple and routine" limitation in the ALJ's RFC.[198] In *Hampton I*, the court reviewed and discussed Dr. Zukowsky's opinion, but only in the

---

[197] AR 891.

[198] Mot. – ECF No. 16 at 5-9.

context of the extent to which the ALJ could appropriately rely on Dr. Zukowsky's opinion as a contradictory medical opinion to support her decision to give only limited weight to Dr. Zipperle's medical opinion. 2014 WL 3962618, at *6–9. In these circumstances, the court declines to find that Mr. Hampton's current issue on review (relating to Dr. Zukowsky's opinion regarding Mr. Hampton's ability to "understand and remember 1- and 2-step instructions") is barred under the doctrine of the law of the case, given that that element was not a substantive part of the court's decision in *Hampton I. See Ortega v. O'Connor*, 50 F.3d 778, 780 (9th Cir. 1995) ("'[A] judgment of reversal by an appellate court is an adjudication only of matters expressly discussed and decided.'") quoting *Hansen & Rowland v. C.F. Lytle Co.*, 167 F.2d 998, 999 (9th Cir. 1948).

The court now turns to the merits of Mr. Hampton's argument in this action.

### 3.2    Inconsistency between ALJ's RFC and Dr. Zukowsky's Assessment

"[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Com'r of Social Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015); *see also Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("it is the responsibility of the ALJ, not [a] physician, to determine residual functional capacity [RFC]"). The ALJ's determination of a claimant's RFC must be based on the medical opinions and the totality of the record. 20 C.F.R. §§ 404.1527(d), 404.1546(c). Moreover, the ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

As noted above, Mr. Hampton contends that the ALJ erred in formulating her RFC assessment because the ALJ "implicitly" rejected the medical opinion of the non-examining psychiatric

consultant, Dr. Zukowsky.[199] Specifically, Mr. Hampton argues that although the ALJ stated that she gave "great weight" to Dr. Zukowsky's opinion, her RFC assessment (finding that Mr. Hampton could perform work that is "simple and routine within a maximum Specific Vocational Preparation (SVP) of 2") was not supported by Dr. Zukowsky's medical opinion (which assessed Mr. Hampton as being able to "understand and remember 1- and 2-step instructions" and concluded that "[e]mployment success [is] most likely if assigned 1- or 2-step duties in a non-public setting").[200] Mr. Hampton asserts that while these two assessments (in the ALJ's RFC and in Dr. Zukowsky's report) "may seem consistent," they are "not the same."[201] The court agrees.

As a preliminary matter, Mr. Hampton notes that the ALJ's finding that Mr. Hampton was limited to work with a "maximum SVP of 2"[202] "is not the determinative factor in assessing whether the ALJ's RFC determination is consistent with Dr. Zukowsky's opinion."[203] The court agrees. "The SVP level is not [] synonymous with the simplicity of a task." *Ferguson v. Colvin*, No. 3:15-CV-01532-SU, 2016 WL 7042076, at *2–3 (D. Or. Dec. 2, 2016) (citing *Smith v. Colvin*, No. 3:14-cv-01210-PA, 2016 WL 680535, at *11 (D. Or. Feb. 19, 2016) (finding that the "ALJ conflated two separate vocational considerations in formulating the RFC …: the SVP level and the simplicity or complexity of the task")).

Instead, Mr. Hampton contends, the DOT's general education development ("GED") Reasoning Level is the "relevant vocational factor" by which to assess a claimant's ability to

---

[199] *Id.* at 5–6.

[200] *Id.* at 5–6 (quoting AR 793 & 406).

[201] *Id.* at 6.

[202] The Social Security Administration uses (and has taken administrative notice of) the DOT, which gives detailed physical requirements for a variety of jobs. See 20 C.F.R. §§ 416.966(d)(1), 15666(d)(1). The DOT defines "significant vocational preparation" or "SVP" as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, App. C, § 2, 1991 WL 688702 (4th ed. 1991). "The higher the SVP rating, the more time it takes to equal average performance in that occupation." *Nava v. Colvin*, No. 3:14-cv-01348-AA, 2015 WL 5854074, at *5 (D. Or. Oct. 6, 2015). An SVP of 2 means "anything beyond a short demonstration up to and including 1 month." *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230 (9th Cir. 2009).

[203] Mot. – ECF No. 16 at 6.

perform a given job.[204] In support of his argument, he cites *Hiblar v. Colvin*, No. C15-5093-BJR-MAT, 2015 WL 5254276, at *6 (W.D. Wash. Aug. 11, 2015), report and recommendation adopted, No. C15-5093-BJR, 2015 WL 5285806 (W.D. Wash. Sept. 9, 2015) (finding that "[t]he relevant vocational factor would be, instead [of the SVP level], the general education development reasoning level, which measures the level of general education required to perform particular job tasks").

The Ninth Circuit took a similar approach in *Rounds* and observed:

> There are six GED Reasoning Levels that range from Level One (simplest) to Level Six (most complex). The lowest two levels are:
>
> Level 1: Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
>
> Level 2: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

807 F.3d at 1002–03 (citations omitted).

In *Rounds*, the Ninth Circuit remanded an appeal from the denial of disability when the ALJ (and the VE) failed to "address[] whether Rounds' limitation to one- to two-step tasks [as stated in the RFC] was consistent with jobs requiring Level Two reasoning and, if so, why." 807 F.3d at 1003. The court noted that "[t]here was an apparent conflict between Rounds' RFC, which limits her to performing one- and two-step tasks, and the demands of Level Two reasoning, which requires a person to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions;'" the court noted that "[t]he conflict between Rounds' RFC and Level Two reasoning is brought into relief by the close similarity between Rounds' RFC and Level One reasoning. Level One reasoning requires a person to apply commonsense understanding to carry out simple one- or two-step instructions." 807 F.3d at 1003 (internal quotation marks and citation omitted).

---

[204] *Id.* at 7.

Here, Mr. Hampton's contention is a similar, but slightly precursor, argument. Mr. Hampton contends that the ALJ erred because she gave "great weight" to Dr. Zukowsky's assessment, including specifically noting Dr. Zukowsky's assessment that Mr. Hampton could "understand and remember to one- and two-step instructions," but failed to explicitly consider or reflect that in her RFC (or explain with appropriate reasons why she was not incorporating that medical assessment into her RFC).[205] The court agrees. Specifically, Mr. Hampton, relying on *Rounds*, argues that (1) Dr. Zukowsky's assessment of Mr. Hampton's ability to "understand and remember 1- and 2-step instructions" matches the Level 1 standard of "carry[ing] out simple one- or two-step instructions" and is exceeded by the Level 2 standard of "carry[ing] out detailed but uninvolved written or oral instructions," and (2) the jobs that the ALJ determined (in consultation with the VE) that Mr. Hampton was capable of performing were all GED Level 2 or even Level 3 positions (an assertion that the Commissioner does not dispute).[206]

Applicable regulations, rulings, and case law require that an ALJ's determination of a claimant's RFC must be based on the medical opinions and the totality of the record and that if the ALJ's RFC assessment "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling 96–8p;[207] 20 C.F.R. §§ 404.1546(c), 416.927(b) (ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence); *Lubin v. Comm'r of Soc. Sec. Admin*, 507 Fed. Appx. 709, 712 (9th Cir. 2013) ("ALJ must include all restrictions in the residual functional capacity [RFC] determination"); *see Lusardi v. Astrue*, 350 Fed. Appx. 169, 173 (9th Cir. 2009) (in determining claimant's RFC, the ALJ must not reject "significant probative evidence" without explanation); *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (an ALJ

---

[205] *Id.* at 6 (citing AR 797).

[206] *Id.* at 6-9; *see generally* Mot. – ECF No. 19.

[207] "Social Security Rulings (SSRs) 'do not carry the "force of law," but they are binding on ALJs nonetheless.' *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir.2009). They "'reflect the official interpretation of the [SSA] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations."' *Id.* (alteration in original) (quoting *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006))." *Molina*, 674 F.3d at 1114.

errs when he rejects a medical opinion by ignoring it or failing to provide specific and legitimate reasons for crediting a different opinion over the one in question); *Rounds*, 807 F.3d at 1006 (ALJ is responsible for reviewing and incorporating medical "findings into a succinct RFC"); *Garrison*, 759 F.3d at 1010 (ALJ is responsible "for resolving ambiguities" in the record and errs if she "rejects a medical opinion or assigns it little weight" without explanation or without explaining why) (internal quotation marks and citation omitted); *see also Huntsberry v. Berryhill*, 2017 WL 2438527, at *9 (N.D. Cal. June 6, 2017) (citing *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ, however, "is not required 'to agree with everything [that a non-treating, non-examining physician] says in order to find that his testimony contains 'substantial evidence' supporting the ALJ's determination"). Moreover, the Ninth Circuit has held:

> A hypothetical question [to the VE] should set out all of the claimant's impairments. If the [RFC and] the "assumptions [upon which] the hypothetical are [based are] not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value. The most appropriate way to insure the validity of the hypothetical question posed to the vocational expert is to base it upon evidence appearing in the record, whether it is disputed or not. . . . Unless there is record evidence to adequately support this assumption, the opinion expressed by the vocational expert is meaningless. [If] neither the hypothetical nor the answer properly set forth all of [the claimant's] impairments, the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's findings.

*Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (internal quotation marks and citation omitted); *Lubin v. Comm'r of Soc. Sec. Admin*, 507 Fed. Appx. 709, 712 (9th Cir. 2013) ("ALJ must include all restrictions in . . . the hypothetical question posed to the vocational expert [VE]").

Here, the Commissioner resists the obvious similarity between Dr. Zukowsky's assessment and the GED Reasoning Level 1 and the apparent discrepancy between Dr. Zukowsky's "1- and 2-step instructions" assessment and the ALJ's RFC assessment by raising various counter-arguments, including, *inter alia*, the following: (1) Dr. Zukowsky "merely" found that Mr. Hampton could follow "1- and 2-step instructions," not that this was necessarily the limit of his capability; (2) other evidence in the record as a whole supports the ALJ's RFC, including Dr. Zipperle's assessment (that Mr. Hampton could "perform simple and repetitive tasks," an assessment previously given only "limited weight" by the ALJ); and (3) Dr. Zukowsky found that

Mr. Hampton could "'at least perform duties of a few steps in a competitive, nonpublic work setting,'" [208] implying that Mr. Hampton could "perform[] at least three step tasks." [209] While these various explanations and rationales offered by the Commissioner may or may not have merit, the ALJ did not adopt or reference them or otherwise adequately articulate her reasonings. The court declines the Commissioner's entreat to undertake such an endeavor on behalf of the ALJ. The court instead finds that the ALJ failed to articulate an adequate reason for her decision to incorporate (or not) this part of Dr. Zukowsky's assessment into her RFC assessment and that her failure to do so in these circumstances was an error. *See generally Garrison*, 759 F.3d at 1012–13. On remand, the ALJ may be able to offer reasons, but the court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Rounds*, 807 F.3d 996, 1003–04 (9th Cir. 2015) (internal quotation marks and citations omitted). An ALJ does not have to address all grounds for its decision for a court to uphold the ALJ's decision as supported by substantial evidence in the record as a whole. *Molina*, 674 F.3d at 1122 (failure to discuss certain evidence was inconsequential to the ultimate disability determination). And an error — viewed in the context of the record as a whole — can be harmless. *Id.* at 1111, 1122. But the omitted considerations here — the interplay between Dr. Zukowsky's assessment of Mr. Hampton's ability and the jobs that the ALJ identified (after consulting with the VE) that appear to be GED Reasoning Level 2 or higher — are material considerations, and the court cannot find the ALJ's failure to consider them explicitly to be harmless. *See id.* at 1115; *see also Zavalin v. Colvin*, 778 F.3d 842, 848 (9th Cir. 2015); *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (holding that the ALJ's failure to reconcile apparent conflict between the RFC and DOT was not harmless error). It is the ALJ's job to determine the RFC based on the medical opinions and the totality of the record and to resolve any ambiguities. 20 C.F.R. §§ 404.1527(d),

---

[208] Mot. – ECF No. 19 at 8 (quoting from AR 409). The court finds some ambiguity regarding whether it is appropriate to attribute this finding (and others from this same AR citation) to Dr. Zukowsky. The Commissioner and the district court in *Hampton I* all attributed it to Dr. Zukowsky. *See e.g.,* AR 896. The document itself appears to be a summary of various medical evidence that was signed by a "D. Pong, MD." On remand, it may be possible to clarify and resolve this ambiguity and determine to what extent, if any, this affects the analysis of Mr. Hampton's claim.

[209] Mot. – ECF No. 19 at 8.

1    404.1546(c); *Garrison*, 759 F.3d at 1010.

2    **3.3    The ALJ's Failure to Consider All of Mr. Hampton's Limitations in the RFC**

3    Finally, the ALJ concluded, based on the medical evidence, that Mr. Hampton has "moderate

4 difficulties" with regard to "concentration, persistence or pace."[210] The ALJ did not address this

5 limitation in her RFC analysis or her questions to the VE,[211] and it is an additional basis for

6 remand.

7    As previously discussed, the ALJ concluded that Mr. Hampton can perform "light work" that

8 is "simple and routine with a maximum Specific Vocational Preparation (SVP) of 2."[212] This RFC

9 does not explicitly account for the moderate limitations that the ALJ assigned to Mr. Hampton

10 regarding concentration, persistence, and pace. *See Friesth v. Berryhill*, 2017 WL 901882, at *5

11 (C.D. Cal. Mar. 7, 2017) (the ALJ erred when the ALJ determined that the claimant was

12 moderately limited in maintaining concentration, persistence, or pace, but the RFC only limited

13 the claimant to simple, repetitive work); *Jahnsen v. Berryhill*, 265 F. Supp. 3d 992, 999 (D. Alaska

14 July 13, 2017). Similarly, in her first hypothetical question to the VE, the ALJ did not explicitly

15 incorporate any limitations in concentration, persistence, or pace.[213] *See Brink v. Comm'r of Soc.*

16 *Sec. Admin.*, 343 Fed. Appx. 211, 212 (9th Cir. 2009) (accepting medical evidence that claimant

17 had moderate difficulty maintaining concentration, persistence, or pace and holding that posing the

18 hypothetical question to vocational expert referencing "simple, repetitive work" was error).

19

20 ───────────────

21 [210] AR 792.

22 [211] Mr. Hampton does not raise this issue explicitly in his summary-judgment motion. Ordinarily, a court "will not consider any claims that were not actually argued in appellant's opening brief." *Indep.*
23 *Towers of Wash. v. Washington*, 350 F.3d 925,929 (9th Cir. 2003). But the "court [has a] duty to make 'a full review of the facts' and 'an independent determination as to whether the [Commissioner's]
24 findings are supported by substantial evidence.'" *Farley v. Colvin*, 231 F. Supp. 3d 335, 339 & n.5 (N.D. Cal. 2017) (quoting *Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir. 1985) (In *Farely*, the district
court raised an issue *sua sponte* in a Social Security denial-of-benefits case despite the normal
25 presumptions against the court's *sua sponte* raising non-jurisdictional claims and provided a summary of other similar decisions in other districts);*Vasquez*, 572 F.3d at 591(court has the obligation to
26 review the record for findings that are based on legal error or that are not supported by substantial evidence in the record as a whole).

27 [212] AR 793.

28 [213] AR 842–44.

United States District Court
Northern District of California

An ALJ's failure to explicitly consider concentration, persistence, and pace limitations is not necessarily error. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2015). In *Stubbs-Danielson*, for example, the Ninth Circuit held that the ALJ translated the plaintiff's condition — including the pace and mental limitations — into a physician's assessment of a restriction to "simple tasks." *Id.* (following other circuits and holding that an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony). But here, given the omission regarding the interplay between Dr. Zukowsky's assessment of Mr. Hampton's ability and the jobs identified by the ALJ that appear to be GED Reasoning Level 2 or higher (considerations that the court deems material), the ALJ on remand should specifically address the limitations related to concentration, persistence, or pace in the RFC determination and the questions posed to the VE. *See Lubin v. Comm'r of Soc. Sec. Admin*, 507 Fed. Appx. 709, 712 (9th Cir. 2013) ("ALJ must include all restrictions in the residual functional capacity [RFC] determination and the hypothetical question posed to the vocational expert [VE], including moderate limitations in concentration, persistence, or pace"); *Brink v. Comm'r of Soc. Sec. Admin.*, 343 Fed. Appx. 211, 212 (9th Cir. 2009). On this record, the court does not find the error harmless. *See Molina*, 674 F.3d at 1115.

## CONCLUSION

The court grants Mr. Hampton's summary-judgment motion, denies the Commissioner's cross-motion, and remands this case for further proceedings consistent with this order.[214]

**IT IS SO ORDERED.**

Dated: June 8, 2018

LAUREL BEELER
United States Magistrate Judge

---

[214] The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Charter*, 80 F.3d 1273, 1292 (9th Cir. 1996); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989)) ("[t]he decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court"). Generally, "'[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)) (alteration in original).